**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **OTIS WADE, JR.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 12 C 8260** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Otis Wade, Jr. brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff filed a summary judgment motion seeking reversal of the Administrative Law Judge's decision, and the Commissioner filed a cross-motion seeking affirmance of the decision. After careful review of the parties' briefs and the record, the Court denies Plaintiff's motion, grants the Commissioner's motion, and affirms the ALJ's decision.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on February 13, 2009 and for SSI on July 8, 2009, alleging that he became disabled beginning on December 31, 2006 due to depression,

---

[1]     On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security, and is automatically substituted as Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

high blood pressure, and diabetes, which caused balance problems, insomnia, and hand tremors. (R. 16, 134-36, 168). The Social Security Administration denied the applications initially on October 21, 2009, and again on reconsideration on May 3, 2010. (R. 20, 72-75). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Patricia J. Bucci held a hearing on April 15, 2011, where she heard testimony from Plaintiff, represented by counsel, and a vocational expert. (R. 45-71). On May 18, 2011, the ALJ found that Plaintiff is not disabled and is capable of performing jobs that exist in significant numbers in the regional and national economy. (R. 31-33). The Appeals Council denied Plaintiff's request for review on August 20, 2012. (R. 1-5).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. In his brief, Plaintiff argues that the ALJ erred by (1) failing to give sufficient weight to the opinion of his counselor Alicia Carter; (2) failing to fully account for his mental impairments in the RFC assessment, and (3) finding him not fully credible without considering the limitations on his daily activities and his allegations of hand tremors, anemia, and hip and leg pain.

## **FACTUAL BACKGROUND**

Plaintiff was born on November 8, 1958 and was 48 years old on his alleged disability onset date. (R. 31). He completed two years of college. (R. 31, 172). Plaintiff's past relevant experience included working full-time as a certified nursing assistant from 1996 to 2003 and part-time as a church maintenance worker from 2003 until he was fired in 2006 when he had an altercation with his new supervisor.[2] (R. 31, 57-58, 64, 169).

---

[2] The record is unclear as to whether Plaintiff's disability onset date of December 31, 2006 coincided with his termination or arose from a health-related or other incident.

## A. Plaintiff's Medical History

### 1. Treatment Prior to Denial of Benefits

The earliest medical documentation in the record is an admission to Provident Hospital from May 21-23, 2007 due to chest pain, shortness of breath upon exertion, and dizziness. (R. 296-316). The ER notes indicate "poorly controlled" diabetes and a right hand asterixis (tremor). (R. 296). A stress test revealed moderately to markedly reduced functional capacity/exercise tolerance, produced no chest pain or reproduction of symptoms, and was inconclusive for ischemia due to an inadequate heart rate achieved. (R. 309). Plaintiff was prescribed medication for his diabetes and referred to his primary care doctor for follow-up. (R. 307-08).

A year later, on May 28, 2008, Plaintiff returned to Provident Hospital for "'med refill & checkup.'" (R. 283). He complained of difficulty writing due to his hand shaking, which he had experienced "for his entire life," but which "got worse" around 2003. (*Id.*). He also reported some tingling in his lower legs. (*Id.*). The doctor refilled Plaintiff's diabetes and hypertension (high blood pressure) prescriptions and diagnosed him with an intension tremor, for which he referred him to a neurologist. (R. 284).

Plaintiff's mental health issues are first documented beginning in early 2009. On February 17, 2009, a new client Psychiatric Evaluation Form was completed by a psychiatrist at the Human Resources Development Institute (HRDI).[3] (R. 257-60). Plaintiff reported that he was staying with his sister, but she would be moving and he will be homeless soon. (R. 257). He complained of problems with his hands shaking

---

[3] Plaintiff testified at his hearing before the ALJ that he began living at HRDI in 2009 and was still living there at the time of the hearing. (R. 54). HRDI provides residential and outpatient services in, among other areas, mental health and alcohol and substance abuse. *See* Human Resources Development Institute, Inc., http://www.hrdi.org (viewed Jan. 30, 2014).

and trouble balancing "off and on" since 1992, as well as depression. (*Id.*). He had never seen a psychiatrist for treatment. (*Id.*). He had a history of alcoholism but had been sober for 15 years. (*Id.*). Plaintiff had no suicidal or homicidal ideation, thought disorder, incoherence, illogical thinking, or hallucinations. (R. 259). His appetite was decreased; he had insomnia; his energy, concentration and loss of interest/libido was decreased; and his consciousness was clear. (*Id.*). He was oriented, his memory was intact, and his attention and concentration were impaired. (*Id.*). The psychiatrist diagnosed him with major depression that is recurrent and severe, and recommended that he "may benefit from psychotropics" and "needs psychosocial support and rehab." (R. 260).

The psychiatrist prescribed Celexa for Plaintiff's depression, but in March 2009 switched him to Lexapro, which was refilled on seven more occasions through the end of 2009. (R. 387). At a follow-up psychiatric appointment on April 22, 2009, Plaintiff reported that he "likes Lexapro, feels less depressed, [is] sleeping [and] eating OK, has [a] good sleep schedule." (R. 328). At his next follow-up on May 20, 2009, Plaintiff reported that "Lexapro made him sleepy" but his "response is good" so the doctor switched him to a p.m. medication schedule. (*Id.*). On June 18, 2009, the doctor simply noted that Plaintiff was "doing OK." (*Id.*).

On July 28, 2009, Gwendolyn Cobb of HRDI, whose title and credentials are not specified, completed a Mental Impairment Questionnaire for Plaintiff. (R. 319-22). Ms. Cobb stated that she sees Plaintiff three times per week, but did not specify in what capacity. (R. 319). She reported that he takes 20 mg of Lexapro once daily, and checked off the following symptoms associated with Plaintiff's depression: appetite

disturbance with weight change, sleep disturbance, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, decreased energy, and intrusive recollections of a traumatic experience. (*Id.*). She concluded that his impairments or treatment would cause Plaintiff to be absent from work more than three times per month. (R. 320). She further concluded that he has moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; constant deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and continual episodes of deterioration or decompensation in work or work-like settings. (R. 322).

However, on September 15, 2009, Plaintiff reported to his HRDI psychiatrist that "'I am not depressed often, some days I feel sad and then I take my medicine.'" (R. 391). Plaintiff denied any recent depressed mood, feelings of hopelessness, hallucinations, or sleep disturbance. (*Id.*). On October 13, 2009, Plaintiff told the psychiatrist that he is "better" and was "sleeping well," and the psychiatrist concluded that he was "stable."

### 2. Consulting Assessments for Benefits Application

#### a. Physical Assessments

On October 5, 2009, Charles Carlton, MD completed an Internal Medicine Consultative Examination for the Illinois Bureau of Disability Determination Services ("DDS"). (R. 330-40). Plaintiff's chief complaints were balance problems, sleeplessness, depression, and weakness and tremors in both hands. (R. 330). Dr. Carlton noted "a history of hypertension and diabetes dating back to 1992" and onset of

depression back in 1986[4] when his mother died," but recounts Plaintiff's present complaints beginning on May 21, 2007, when he experienced chest pain, dizziness, and shortness of breath and was admitted to the hospital with atypical chest pain, diabetes, hypertension, and chronic anemia. (R. 330-31). Plaintiff stated that he believes his tolerance is limited to light work and that "he can handle tasks such as mopping and floor care." (R. 331). Dr. Carlton's musculoskeletal examination showed the following: "Claimant had normal grip strength bilaterally. Grip and prehension ability in each hand was normal. Fine and gross motor skills in each hand were normal." (R. 333). Specifically, Plaintiff was able to perform eight of eight fine and gross manipulative movements of his right and left hands and fingers, and his grip strength was 5 out of 5 in both hands. (R. 335). His neurological examination revealed "no signs of tremors or hand weakness." (R. 333). Dr. Carlton concluded that Plaintiff can sit and stand; walk greater than 50 feet without an assistive device, lift, carry and handle objects using both hands; and lift up to 20 pounds on an occasional basis. (R. 334).

On October 20, 2009, Richard Bilinsky, MD completed a Physical Residual Functional Capacity Assessment for the DDS based on a primary diagnosis of atypical chest pain, a second diagnosis of diabetes, and other alleged impairments of hypertension and chronic anemia. (R. 361-68). He concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) about 6 hours in an 8-hour work day, sit (with normal breaks) about 6 hours in an 8-hour work day, and is unlimited in his ability to push and/or pull other than as shown for lifting and/or carrying. (R. 362). Dr. Bilinsky found that Plaintiff

---

[4]  In a subsequent Mental Status Evaluation, Dr. Patricia Morrin noted that Plaintiff stated his mother died in 1998 or 1999 of complications following open heart surgery. (R. 342).

has no postural, manipulative, or communicative, limitations, but that he has limited far visual acuity and should avoid concentrated exposure to noise and vibrations due to a history of headaches. (R. 363-65). Dr. Bilinsky noted Plaintiff's history of chest pain and reiterated the findings of Dr. Carlton's physical examination. (R. 362-63). He found Plaintiff's statements concerning his pain and limitations to be "partially credible when compared to objective medical evidence in the file," but concluded that the evidence did not support the extent of limitations described by Plaintiff in terms of his inability to lift over 10 pounds and his limitations in squatting, bending, reaching, kneeling, stair climbing, using hands, and sitting. (R. 363).

### b. Mental Assessments

On October 5, 2009, Patricia M. Morrin, Psy.D. completed a Mental Status Consultative Evaluation for the DDS. (R. 342-46). She spent 45 minutes interviewing Plaintiff, but was provided no medical records to review. (R. 342). She noted that Plaintiff currently lives at HRDI, a mental health facility in Chicago, where he attends groups for anxiety and anger and gets along "'pretty well'" with his roommate. (R. 345, 346). Dr. Morrin observed that Plaintiff reported "sadness, which comes and goes" and that he "does not have very good energy" and "feels like crying but cannot." (*Id.*). Plaintiff has been taking Lexapro since April 2009, denied any previous treatment or hospitalizations for mental health reasons, and sees a psychiatrist and attends groups for anxiety and anger at HRDI. (*Id.*). Dr. Morrin found that Plaintiff's "overall affect and mood were somewhat flat and severely depressed;" his "speech was relevant and coherent, and his articulation was clear;" and his "thought processes were intact, and he denied having any visual hallucinations." (R. 346). She diagnosed him with "[m]ajor

depressive disorder, recurrent, severe without psychotic features" and "[a]lcohol abuse, sustained full remission." (*Id.*).

On October 20, 2009, Kirk Boyenga, PhD completed a Psychiatric Review Technique for the DDS. (R. 347-60). He evaluated Plaintiff under categories 12.04 (affective disorders) and 12.09 (substance addiction disorders). (R. 347). Under category 12.04, Dr. Boyenga concluded that Plaintiff suffers from "disturbance of mood" accompanied by depressive syndrome characterized by loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. 350). Under category 12.09, Dr. Boyenga noted that a full remission was reported. (R. 355). He found Plaintiff's functional limitations to be mild in terms of restrictions of activities of daily living and moderate in terms of difficulties in maintaining social functioning and concentration, persistence, or pace. (R.357). Dr. Boyenga found no episodes of decompensation of extended duration. (*Id.*). He reviewed the mental health medical records on file, but did not give controlling weight to the report by Plaintiff's HRDI therapist because she is not an acceptable medical source. (R. 359). Dr. Boyenga concluded that Plaintiff's allegation of depression is credible. (*Id.*).

Also on October 20, 2009, Dr. Boyenga completed a Mental Residual Functional Capacity Assessment for the DDS. (R. 369-72). He concluded that Plaintiff is moderately limited in his ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and

length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting. (R. 369-70). Dr. Boyenga summarized his assessment as follows:

> Claimant experiences an affective disorder and the history of a substance addiction. The addiction is reported to be in sustained, full remission. Claimant is currently in outpatient mental health care. His therapist completed a summary of residual capacity, indicating severe limitations; however, she is not an acceptable source. Claimant's treating psychiatrist documents only the prescription of an antidepressant medication, with the last available note indicating that claimant was doing ok. An earlier assessment indicates that claimant was unable to work due to a tremor. That and other physical limitations have been addressed elsewhere. On recent examination claimant is fully oriented and free of thought disorder. He is also able to manage personal hygiene, do laundry, attend group meetings and make purchases. Claimant is capable of performing simple tasks. Social skills are impaired, but allow settings with reduced interpersonal contact. Claimant relates well with treating sources. Adaptation abilities are limited, but allow routine, repetitive tasks. Claimant can follow instructions and travel independently.

(R. 371).

The Social Security Administration denied the applications initially on October 21, 2009, and again on reconsideration on May 3, 2010. (R. 72-75).

### 3. Treatment After Denial of Benefits

On November 23, 2009, Plaintiff saw Dr. Chukwudozie Ezeokoli at Stroger Hospital, who noted that Plaintiff suffers from diabetes mellitus, hypertension, and smoking. (R. 273). Plaintiff was taking Metformin for diabetes and Enalapril and Metoprolol for high blood pressure. (*Id.*). Plaintiff complained of leg weakness, shortness of breath on exertion with no chest pain, and leg and hip pain. (*Id.*). Dr. Ezeokoli found Plaintiff's diabetes and hypertension to be well controlled, and referred him for a stress test. (R. 273-74).

Plaintiff saw Dr. Ezeokoli again on March 12, 2010, where he was given Nifedipine for his high blood pressure and told to continue his diabetes and depression medications and see a psychiatrist. (R. 397). On April 22, 2010, he was seen by a Lung Health Educator at Stroger Hospital and referred to a smoking cessation group. (R. 486). On July 22, 2010, he saw Dr. Ezeokoli for lower right back pain and an initial gastrointestinal exam. (R. 412).

On November 1, 2010, Plaintiff saw Dr. Ezeokoli for a follow-up appointment after he was seen at an "outside clinic and told he needed a blood transfusion because his blood [count] was too low" due to anemia. (R. 406). Dr. Ezeokoli referred him to hematology, noted that his hypertension was well controlled, and switched his diabetes medicataion from Metformin to Glipizide. (R. 407).

Meanwhile, Plaintiff continued to receive psychiatric treatment at HRDI. On December 24, 2009, Plaintiff reported to his psychiatrist that he was "doing good" and denied any new symptoms. (R. 391). At their next meeting on March 10, 2010, Plaintiff denied any psychosis or sustained mood changes. (*Id.*). On March 25, 2010, an HRDI psychiatrist completed a Psychiatric Evaluation Form as part of an annual evaluation process. (R. 253-56). The form notes that Plaintiff is "stabilized with psychotherapy and meds" and "will cont[inue] present management." (*Id.*). The psychiatrist specified that Plaintiff has no suicidal or homicidal ideation, thought disorder, incoherence, illogical thinking, or hallucinations. (R. 254). His appetite increased, his energy and concentration were unchanged, his loss of interest/libido decreased, and his consciousness was clear. (*Id.*). He was oriented and his memory and

attention/concentration were intact. (*Id.*). His diagnosis of depression was unchanged and it was recommended that he continue his current medication. (R. 256).

Around this same time period, Plaintiff's HRDI psychiatrist altered his depression medications, switching him from Lexapro to Cymbalta on March 10, 2010, but returning him to Lexapro on April 8, 2010 because the Cymbalta upset his stomach. (R. 386, 390). On April 22, 2010, Plaintiff presented to Stroger Hospital seeking refills of his medications, including Lexapro; the doctor's notes indicate that Stroger reissued prescriptions Plaintiff had just received from Provident Hospital. (R. 263). Several days later, on April 27, 2010, HRDI switched Plaintiff to Celexa, which was refilled five times through October 6, 2010. (R. 386). Plaintiff saw his HRDI psychiatrist on five more occasions from May to October 2010. (R. 389-90). In May and June, his psychiatrist noted that he was "doing OK" and had "no problems or new changes," and in mid-June his case manager noted that he was hoping to secure a job through the Ticket to Work program. (R. 390, 445). By August, he complained to his psychiatrist that his hand tremors had worsened. (R. 390). On September 8, 2010, he reported that he was not sleeping well, had a reduced appetite, and was "still depressed." (R. 389). At the last psychiatrist visit documented in the record, on October 6, 2010, Plaintiff reported "no problems" and said he was "sleeping better." (*Id.*).

Plaintiff also received individual counseling from an HRDI mental health professional during this time period. He met with his case manager on approximately 47 occasions between January 8, 2010 and September 2, 2010. (R. 434-80). On September 8, 2010, Alicia Carter took over as Plaintiff's primary case manager and met with him on six occasions between September 10, 2010 and November 10, 2010. (R.

426, 429-33).  On September 13, 2010, her notes state that Plaintiff "was alert and stable and in good spirits" and was compliant with his medications.  (R. 432).  On September 17, 2010, her notes reflect that she educated Plaintiff about his depression diagnosis, to which he responded that "'this information helps me to get a better understanding of my illness.'"  (R. 431).  On September 20 and 30, 2010, she discussed with Plaintiff his applications for entitlement funding, including SSI.  (R. 429-30).

On October 5, 2010, Ms. Carter completed a Mental Impairment Questionnaire for Plaintiff.  (R. 276-79).  Ms. Carter stated that she sees Plaintiff three times per week, and that he is diagnosed with major depression, diabetes, high blood pressure, and severe tremors.  (R. 276).  She checked off the following symptoms associated with Plaintiff's diagnosis:  appetite disturbance with weight change, sleep disturbance, feelings of guilt/worthlessness, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and intrusive recollections of a traumatic experience.  (*Id.*).  She concluded that his impairments or treatment would cause Plaintiff to be absent from work more than three times per month.  (R. 277).  From a checklist, she identified Plaintiff's mental abilities and aptitude needed to do unskilled work as "poor/none" for the following:  maintaining attention for a two-hour segment, working in coordination with or proximity to others without being unduly distracted, completing a normal workday or work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and dealing with normal work stress.  (R. 278).  Ms. Carter concluded that Plaintiff has moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; constant deficiencies of concentration, persistence, or pace resulting in

failure to complete tasks in a timely manner; and continual episodes of deterioration or decompensation in work or work-like settings.  (R. 279).

On January 5, 2011, Plaintiff saw hematologist Shivi Jain, MD at Stroger Hospital for evaluation of his anemia.  (R. 489).  Dr. Jain's impression was hypertension with nomocytic anemia of unclear etiology (cause), for which he recommended a series of blood tests.  (*Id.*).  There is no further medical documentation after this date.

## B.    Plaintiff's Testimony

In an August 12, 2009 Function Report submitted in support of his application for benefits, Plaintiff stated that he "cannot write or hold anything" because "my hands shakes a lot [sic], I cannot steady them to write."  (R. 177).  He stated that he cannot shave and has trouble feeding himself because of the shaking.  (*Id.*).  Meal preparation and cleaning are performed by staff in his group home, but he does his own bathing, laundry and shopping without assistance.  (R. 177-79).  He travels to the community center five days per week for group therapy.  (R. 176, 180).  He has difficulty walking stairs, squatting and kneeling due to low back and right hip pain; can walk 8 blocks at a slow pace before needing to rest; and has difficulty following instructions.  (R. 177, 181-82, 185).  He stays awake "most of the night" and cannot sleep more than 2 hours at a time.  (R. 177).  In a March 24, 2010 Function Report submitted in support of his application for reconsideration of the denial of benefits, Plaintiff's statements about his daily activities and limitations were largely unchanged from the prior report, except that he stated he can only walk a block and a half before needing to rest.  (R. 212-22).

At the hearing before the ALJ on April 15, 2011, Plaintiff testified that he has lived in HRDI housing since 2009 and currently lives in his own HRDI apartment.  (R. 52, 54).

He prepares meals for himself so long as he does not splash on himself due to his hand tremors, does his own grocery shopping, and takes public transportation. (R. 53). On a typical day, he gets picked up by van to go to the HRDI center for group meetings, plays cards and dominoes, and sits around. (R. 55).

Plaintiff testified that he takes medication for diabetes, high blood pressure, and depression. (R. 54). He becomes short of breath when he walks "too far" or climbs stairs, and also has problems walking because his "right hip goes out." (R. 54, 56). He testified that he injured his hip when he fell down a flight of stairs while doing maintenance, and that he reported the pain to his doctor, who "told me don't lift nothing over 10 pounds." (R. 57). He stated that he can walk "like half a block," "can stand all day" so long as he is not moving, and can only sit for about 30 minutes "'cause I get stiff." (R. 56-57). Plaintiff also testified that he has "continuous" hand tremors that cause him difficulty with gripping and writing. (R. 58). As a result, it takes him "a while" to button or zip his clothes and he has dropped cups and mugs. (R. 58). He believes he will have difficulty standing and lifting to perform work. (R. 60). Plaintiff has been seeing a psychiatrist for depression, but "[s]ometimes I get upset" and his memory "comes and goes." (R. 60-61). He tends to "stay by myself" and has less energy due to difficulty sleeping. (R. 61-62).

In response to questions from his attorney, Plaintiff testified that the problem with his grip "comes and goes," so he could grab something several times but not all day long. (R. 62). He also stated that he reads email on the computer, which he can do "[a]s long as my hand is flat," but he cannot type to send emails. (R. 63). He avoids

going out to eat since he does not like people looking at him when his hands shake and he drops utensils.  (R. 63-64).

**C.      Vocational Expert's Testimony**

Sheryl Larivoiso testified at the hearing as a vocational expert ("VE").  (R. 64-70). She identified Plaintiff's past relevant work as certified nursing assistant (or "nurse aid" in the Dictionary of Occupational Titles), classified as semi-skilled work at the medium physical demand level that was performed at the heavy level, and commercial or institutional cleaner, classified as heavy, unskilled work that was performed at the heavy level.  (R. 65).

The ALJ then described to the VE a hypothetical individual of Plaintiff's age, education, and work experience who "can perform a range of light work with limited far acuity, and the individual must avoid concentrated exposure to noise and vibrations" and "would be limited to simple tasks, having only occasional interpersonal contact." (R. 66).  The VE testified that such an individual would be able to perform the job of housekeeping cleaner (10,000 positions regionally), hand packager (15,000), and production assembler (1,000).  (R. 66-67).

The ALJ then presented a second hypothetical that maintained the restrictions described in the first hypothetical but added the additional restriction of "no lifting greater than 10 pounds, and no standing and walking for more than two hours in an eight hour day."  (R. 67).  The VE testified that such an individual would be able to perform two sedentary, unskilled jobs:  hand packager (1,300 positions regionally of a different type than those under the prior hypothetical) or production worker (700).  (R. 67).

The ALJ next presented a third hypothetical that maintained the restrictions described in the second hypothetical but added the additional restrictions that the individual "would be absent more than three times a month, and would have poor or no ability in maintaining attention concentration for a two-hour segment; being able to work in coordination with a proximity to the others [sic] without being distracted, complete a normal work day and work week without interruptions for psychologically-based symptoms, perform at a consistent pace without unreasonable number and length of rest periods, and deal with normal work stress."  (R. 68).  The VE testified that there would be no work that such an individual could perform.  (*Id.*).

Next, Plaintiff's attorney asked the VE if the individual described in the first hypothetical could still perform the jobs identified if an additional restriction of "occasional use of bilateral hands" was added.  (R. 69).  The VE testified that bilateral use of the hands is "frequent" for those light jobs identified in the first hypothetical, and that sedentary jobs such as those identified in the second hypothetical require "good use of the hands."  (*Id.*).  The ALJ followed up by asking the VE if such a restriction would eliminate all jobs, to which the VE replied that the only other jobs with "occasional handling and reaching" would be counter clerk, information clerk, or ticket taker, but noted that those jobs involved interacting with the public.  (R. 69-70).

D.    **ALJ's Decision**

In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff has not engaged in substantial gainful activity since the alleged onset date of December 31, 2006.  (R. 18).  At Steps 2 and 3, she determined that Plaintiff has the severe impairments of major depressive disorder,

diabetes, hypertension, hand tremors, anemia, and atypical chest pain, and the non-severe impairment of a history of alcohol abuse in remission, but that none of these impairments meet or equal any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 18-20).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform light work as he can occasionally life and/or carry 20 pounds, frequently lift and/or carry 10 pounds, can stand and/or walk around 6 hours in an 8-hour workday, can sit about 6 hours in an 8-hour workday, can push and/or pull unlimited, has no postural limitations (climbing, balancing, stooping, kneeling, crouching, crawling), has no manipulative limitations, has limited far acuity but otherwise was not limited visually, has no communicative limitations, and has no environmental limitations except that he should avoid concentrated exposure to noise and vibration. (R. 20-21).   In addition, the ALJ specified that "due to his mental impairments, the claimant was capable of performing simple tasks and routine, repetitive tasks and occasional interpersonal contact."  (R. 21).

FInally, at Step 5, the ALJ found that Plaintiff is unable to perform his past relevant work, but relying on the VE, concluded that there are other jobs that exist in sufficient numbers in the national and regional economy that Plaintiff can perform, given his age, education, work experience, and RFC.  (R. 31-32).  Accordingly, the ALJ found that Plaintiff was not disabled since his alleged disability onset date.  (R. 32).

## **DISCUSSION**

### A.    **Disability Standard**

In order to qualify for DIB or SSI, a claimant must establish that he is "disabled" and eligible for benefits as defined by the Social Security Act.    42 U.S.C. §§ 1382c(a)(3), 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009).    A person is disabled if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."    42 U.S.C. §§ 1382(a)(3)(A), 423(d)(1)(A).    In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, which requires the ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy.    20 C.F.R. §§ 404.1520, 416.920; *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted).    "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled.    A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."    *Zurawski*, 245 F.3d at 885 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520, 416.920.

**B.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act.  42 U.S.C. § 405(g).  A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law."  *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).  Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'"  *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).  The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations."  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from the evidence to the conclusion.'"  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1).

**C.     Analysis**

The Court now addresses in turn each of Plaintiff's arguments challenging the ALJ's decision.

**1.     Opinion of Plaintiff's Counselor**

Plaintiff first argues that the ALJ erred by failing to properly consider the opinion of Alicia Carter, his counselor at HRDI.  The specific opinion at issue is the Mental Impairment Questionnaire prepared by Ms. Carter on October 5, 2010 after Plaintiff's application for benefits was denied.  (R. 276-79).  In her assessment, Ms. Carter

identified Plaintiff's mental abilities and aptitude needed to do unskilled work as "poor/none" in the areas of maintaining attention for a two-hour segment, working in coordination with or proximity to others without being unduly distracted, completing a normal workday or work week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and dealing with normal work stress. (R. 278). She found that Plaintiff has moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; constant deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and continual episodes of deterioration or decompensation in work or work-like settings. (R. 279). Ms. Carter also concluded that Plaintiff would be absent from work more than three times per month due to his mental impairments. (R. 277). Plaintiff contends that the ALJ erred in not giving greater weight to Ms. Carter's assessment, finding that she was not an acceptable medical source, her opinion was conclusory and inconsistent with Plaintiff's daily activities, and hers was "a sympathetic opinion" not supported by the evidence as a whole. (Doc. 22 at 7; R. 30-31). As set forth below, the ALJ's findings in this regard were well-supported by substantial evidence.

In her decision, the ALJ stated that she gave significant weight to the opinions of Dr. Carlton, Dr. Bilinsky, and Dr. Boyenga, but assigned Ms. Carter's opinion "less weight as she is not an acceptable medical source under 20 CFR 404.1513 and 416.913" and Social Security Ruling (SSR) 06-03p. As a preliminary matter, the parties disagree as to Ms. Carter's credentials. Plaintiff appears to assert that Ms. Carter is a licensed clinical social worker (Doc. 22 at 7), however the Commissioner notes that the

record evidence shows only that her credentials are "BA, CAAP, MHP" (Doc. 35 at 3 n.1, citing R. 279), which this Court presumes to mean that she earned a Bachelor of Arts degree and is a Certified Associate Addiction Professional and a Mental Health Professional.

In any event, the analysis of this issue is the same whether Ms. Carter is a licensed clinical social worker or some other form of social worker, counselor or therapist. Counselors such as Ms. Carter are not acceptable medical sources who can provide evidence to establish an impairment, and therefore her opinion is not entitled to controlling weight on this issue. 20 C.F.R. §§ 404.1513(a); 416.913(a); *see also Compton v. Colvin*, No. 11 C 8305, 2013 WL 870606, *10 (N.D. Ill. Mar. 7, 2013). Evidence from such sources may be considered, however, to show the severity of a claimant's impairments and how those impairments affect the ability to work. 20 C.F.R. §§ 404.1513(d); 416.913(d). Plaintiff argues that the ALJ should have afforded Ms. Carter's opinion greater weight concerning the severity of his mental impairments due to the length and frequency of Plaintiff's treating relationship with her. But Ms. Carter began counseling Plaintiff on September 8, 2010, less than a month before she prepared her assessment (R. 433), so the treating relationship was of quite limited duration. As for frequency, while Ms. Carter's assessment states that she meets with Plaintiff three times per week (R. 276), the record shows that she met with him only five times before completing the assessment (R. 429-33), and that the last two of those meetings was focused solely on assisting Plaintiff with his applications for benefits (R. 429).[5] In any event, the ALJ acknowledged in her decision that "the claimant does see

---

[5]     Plaintiff also argues that the ALJ should have considered Plaintiff's full treating history with other professionals at HRDI in assessing how much weight to give Ms. Carter's opinion

her for treatment on a frequent basis," so the ALJ expressly considered the frequency of the treating relationship in assessing how much weight to assign Ms. Carter's opinion. (R. 31).

Plaintiff also takes issue with the ALJ's statement that Ms. Carter's assessment was "conclusory with no support or explanation for her restrictions." (R. 31). The regulations specify that in addition to considering the nature of the examining and treating relationship, an ALJ will consider the "supportability" of an opinion, giving more weight to opinions the more they present relevant evidence and the better they are explained. 20 C.F.R. §§ 404.1527(c)(3); 416.927(c)(3). Here, as the Commissioner notes, Ms. Carter merely checked items on a checklist with no narrative explanation of the source of her conclusions. None of Ms. Carter's progress notes from her five meetings with Plaintiff prior to her assessment supports the severity of the impairments she identifies in her assessment. To the contrary, on September 13, 2010, she noted that Plaintiff "was alert and stable and in good spirits" and was compliant with his medications (R. 432), and her later progress notes are essentially silent as to his condition. Plaintiff argues that Ms. Carter's assessment is supported by the mental status evaluation by state agency consulting psychologist Dr. Morrin who diagnosed Plaintiff with major depression. (Doc. 22 at 8). But while Dr. Morrin's diagnosis of depression is consistent with Ms. Carter's opinion, Ms. Carter's opinion as a non-acceptable medical source is considered only as to the severity of the impairments and

_____

(Doc. 22 at 7-8), although he presents no legal authority to support such a position and there is no evidence that Ms. Carter ever reviewed those records. This argument is nonetheless unavailing since the most recent prior Mental Impairment Questionnaire for Plaintiff was prepared by a different counselor on July 28, 2009, a full 15 months before the one prepared by Ms. Carter. Moreover, the HRDI psychiatrist's notes from his examination of Plaintiff on October 6, 2010 (the day after Ms. Carter's assessment) stated that Plaintiff had "no problems" and was "sleeping better." (R. 389).

how it affects Plaintiff's ability to work, not the diagnosis. On this point, there is nothing in Dr. Morrin's evaluation to support Ms. Carter's conclusions as to Plaintiff's mental limitations and inability to sustain employment.

Finally, Plaintiff makes a cursory argument that the ALJ erred in concluding that it "appears her opinion is a sympathetic opinion as it is not supported by the evidence as a whole." (R. 31). Plaintiff relies solely on *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009), but this case is not analogous. In *Moss*, the Seventh Circuit found that the ALJ erred in discounting the opinion of plaintiff's orthopedic specialist based solely on the fact that plaintiff was referred to the doctor by his attorney to assist in a legal matter and the ALJ failed entirely to address whether the doctor's opinions were supported by medical evidence. *See id.* That is not the situation here. As an initial matter, Ms. Carter is not an acceptable medical source like the treating doctor in *Moss*. Regardless, it is permissible for an ALJ to find a treating physician's opinion less reliable if the doctor is sympathetic, which may be shown if the opinion is inconsistent with a consulting physician's opinion, internally inconsistent, or based solely on the claimant's subjective complaints. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). In *Moss*, the ALJ never considered these factors, but here the ALJ expressly found Ms. Carter's assessment to be lacking in any evidentiary support or explanation, inconsistent with Plaintiff's daily activities, and not supported by the evidence as a whole, including the Mental RFC and Psychiatric Review Technique prepared by consulting psychologist Dr. Boyenga. (R. 30-31). Thus, the ALJ's determination that the opinion was sympathetic and unsupported was not "mere speculation without basis" as Plaintiff contends. (Doct. 22 at 9).

For these reasons, the ALJ did not err in assigning less weight to the assessment prepared by Ms. Carter than she did to the opinions of the consulting doctors.

## 2.     RFC Assessment

Plaintiff next argues that the ALJ erred by failing to fully account in the RFC for Plaintiff's moderate difficulties with concentration, persistence or pace, and that the ALJ's hypotheticals to the VE were therefore deficient.  Specifically, Plaintiff argues that the ALJ disregarded without explanation consulting psychologist Dr. Boyenga's conclusion that Plaintiff is moderately limited in his ability to concentrate, complete a workday without interruption, perform at a consistent pace without an unreasonable number of breaks, interact with the general public, and respond appropriately to changes in the work setting.  He also argues that it was insufficient for the ALJ to account for his difficulties by limiting him to simple tasks and routine, repetitive tasks. Finally, Plaintiff contends that, based on these errors, the hypotheticals to the VE were flawed.  These arguments lack merit.

In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform his past relevant work or adjust to other work, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite his limitations. 20 C.F.R. §§ 404.1520(e), 404.1545; SSR 96–8p, 1996 WL 374184, *2.  The RFC determination is a legal, rather than a medical, one.  20 C.F.R. § 404.1527(d).  In crafting the RFC, an ALJ must consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe. *See* SSR 96–8p, 1996 WL 374184, *5.  An ALJ is not permitted to "play doctor" or make independent medical conclusions that are unsupported by medical evidence or authority

in the record.  *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003);

*Clifford*, 227 F.3d at 870.  But an ALJ need not discuss every piece of evidence, and

need only logically connect the evidence to the ALJ's conclusions.  *See Jones v. Astrue*,

623 F.3d 1155, 1160 (7th Cir. 2010); *Berger*, 516 F.3d at 544.

Here, Plaintiff argues that the ALJ rejected, without discussion, Dr. Boyenga's

findings that he is moderately limited in his ability to concentrate, complete a workday

without interruption, perform at a consistent pace without an unreasonable number of

breaks, interact with the general public, and respond appropriately to changes in the

work setting.  (Doc. 22 at 13-14, referencing R. 369-70).  But Dr. Boyenga made those

particular findings in Section I of the Mental RFC Assessment form and, as the

Commissioner notes, the Social Security Administration's Program Operations Manual

System (POMS) specifically instructs the ALJ that "**Section I is merely a worksheet** to

aid in deciding the presence and degree of functional limitations and the adequacy of

documentation and **does not constitute the RFC assessment.**"  POMS DI

24510.060(B)(2), available at https://secure.ssa.gov/poms.nsf/lnx/0424510060 (viewed

Jan. 30, 2014) (bold in original).  As the POMS makes clear, it is in Section III of the

form "that the **actual mental RFC assessment is recorded,** explaining the conclusions

indicated in section I, in terms of the extent to which these mental capacities or

functions could or could not be performed in work settings."  *Id.* at 24510.060(B)(4)

(bold in original).  In Section III, Dr. Boyenga specified the following RFC:

> On recent examination claimant is fully oriented and free of thought
> disorder. He is also able to manage personal hygiene, do laundry, attend
> group meetings and make purchases. Claimant is capable of performing
> simple tasks. Social skills are impaired, but allow settings with reduced
> interpersonal contact. Claimant relates well with treating sources.

> Adaptation abilities are limited, but allow routine, repetitive tasks. Claimant can follow instructions and travel independently.

(R. 371).  Plaintiff does not contend that the ALJ failed to incorporate these Section III limitations into the RFC, arguing only that the items from Section I also should have been included.   While the POMS is an internal agency guidance document and not legally binding authority, this Court finds it highly persuasive in establishing how the medical source and the Commissioner are directed to use the form in crafting the RFC. In his reply brief, Plaintiff argues that Dr. Boyenga did not explain how he incorporated the limitations from Section I into the RFC in Section III.  But this is mere speculation on Plaintiff's part as Dr. Boyenga's findings in Sections I and III are not inconsistent with one another.   Dr. Boyenga reasonably could have translated the moderate limitations from the Section I worksheet into the RFC in Section III, by limiting Plaintiff to simple, routine, and repetitive tasks and settings with reduced interpersonal contact.   In any event, as many other courts have found, the ALJ need only look to Section III for the RFC assessment as directed by the POMS.  *See Nathan v. Colvin*, No. 12-35797, 2014 WL 28617, *2 (9th Cir. Jan. 3, 2014); *Sullivan v. Colvin*, 519 Fed. Appx. 985, 989 (10th Cir. 2013); Land v. Comm'r of Social Sec., 494 Fed. Appx. 47, 49 (11th Cir. 2012); *Smith v. Comm'r of Social Sec.*, 631 F.3d 632, 637 (3d Cir. 2010); *Baumgartner v. Colvin*, No. 12-C-251, 2013 WL 5874633, *14 (W.D. Wis. Oct. 31, 2013); *Malueg v. Astru*e, No. 06-C-676-S, 2007 WL 5480523, *6-7 (W.D. Wis. May 30, 2007).

Plaintiff also argues that the ALJ did not adequately account for his moderate limitations in concentration, persistence or pace by limiting him to simple tasks, directing the Court to a line of cases in which the Seventh Circuit stated that limiting an individual to simple, routine or repetitive tasks is generally not sufficient to account for deficiencies

in concentration, persistence or pace. (Doc. 22 at 11-12, citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009), *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008), and *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003)). While this is the general rule, where "a medical expert 'translated an opinion of the claimant's medical limitations into an RFC assessment' an ALJ may rely upon that translation." *Adams v. Astrue*, 880 F. Supp. 2d 895, 912 (N.D. Ill. 2012) (quoting *Milliken v. Astrue*, 397 Fed. Appx. 218, 221-22 (7th Cir. 2010)); s*ee also Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (no error where physician translated moderate mental limitations into a specific RFC assessment that the plaintiff could still perform low-stress, repetitive work). That is what happened here. Dr. Boyenga concluded in the Psychiatric Review Technique that Plaintiff has moderate difficulties in maintaining concentration, persistence, or pace (R. 357), and then went on to address in the Mental RFC Assessment the limitations those difficulties impose on his capacity to work.[6] In that Mental RFC Assessment, the doctor

---

[6]    As Social Security Ruling 96–8p specifies, while the Psychiatric Review Technique (PRT) is used at Step 3, the Mental RFC Assessment is used at Steps 4 and 5:

> *The psychiatric review technique.* The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. *The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.*

specified, among other things, that Plaintiff "is capable of performing simple tasks," his "[s]ocial skills are impaired, but allow settings with reduced interpersonal contact," and his "[a]daptation abilities are limited, but allow routine, repetitive tasks." (R. 371). Thus, it was Dr. Boyenga, not the ALJ, who determined that Plaintiff has the capacity to perform simple tasks and routine, repetitive tasks despite his mental limitations. It was Dr. Boyenga who "translated" Plaintiff's mental limitations into an assessment of his capacity to perform work tasks. In crafting the RFC on this point, the ALJ merely adopted the Mental RFC limitations set forth by Dr. Boyenga.

For similar reasons, Plaintiff is incorrect in his assertion that the ALJ failed to pose hypotheticals to the VE that account for his moderate limitations in concentration, persistence or pace. "[T]here is no literal requirement that the terms 'concentration, persistence or pace' be used." *Adams v. Astrue*, 880 F. Supp. 2d 895, 912 (N.D. Ill. 2012) (citing *O'Connor-Spinner*, 627 F.3d at 619-20). As noted above, an ALJ may rely on a medical expert's translation of limitations into an RFC assessment, *Adams*, 880 F. Supp. 2d at 912 (quoting *Milliken*, 397 Fed. Appx. at 221-22), which is precisely what happened here. The ALJ posed an initial hypothetical to the VE, which all subsequent hypotheticals incorporated, that limited the individual to performing "simple tasks, having only occasional interpersonal contact." (R. 66). In fashioning this limitation, the ALJ relied on Dr. Boyenga's Mental RFC Assessment, which found Plaintiff capable of performing "simple tasks" in settings with "reduced interpersonal contact" despite his moderate mental limitations. (R. 371). Thus, the ALJ did not translate Plaintiff's

SSR 96-8p, 1996 WL 374184, *4 (emphasis added). Thus, any attempt by Plaintiff to equate Dr. Boyenga's findings in the PRT (of moderate limitations in concentration, persistence, or pace) with an RFC assessment is unavailing.

moderate limitations in concentration, persistence, or pace into RFC restrictions; she merely adopted the psychologist's translation.

Plaintiff further argues that the ALJ erred by not addressing the VE's testimony concerning the third hypothetical presented by the ALJ, which added additional mental limitations, namely that the individual "would be absent more than three times a month, and would have poor or no ability in maintaining attention concentration for a two-hour segment; being able to work in coordination with a proximity to the others [sic] without being distracted, complete a normal work day and work week without interruptions for psychologically-based symptoms, perform at a consistent pace without unreasonable number and length of rest periods, and deal with normal work stress." (R. 68). The VE testified that there would be no work that such an individual could perform. (*Id.*). But the ALJ was not required to address this testimony because it included limitations not supported by the record, in particular that Plaintiff would be absent from work more than three times per month. This limitation appears nowhere in either the PRT or the MRFC prepared by Dr. Boyenga. While Plaintiff's counselor, Ms. Carter, included it in her assessment, the ALJ properly did not give controlling weight to this opinion for the reasons discussed above. Thus, there is no evidentiary support for such a limitation, and the ALJ was not required to discuss the hypothetical that incorporated it.

For these reasons, the RFC determination is supported by substantial evidence.

### 3. Credibility Finding

Plaintiff next argues that the ALJ erred in finding him not fully credible without considering the limitations on his daily activities and his allegations of hand tremors, anemia, and hip and leg pain. An ALJ's credibility finding is accorded deference and

may be overturned only if it is "patently wrong." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008)).  However, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record," *Pepper*, 712 F.3d at 367 (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)), and must connect credibility determinations to the record evidence by an "'accurate and logical bridge,'" *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010) (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).  For the reasons discussed below, the ALJ's credibility determination is supported by substantial evidence.

### a.    Daily Activities

Plaintiff argues that the ALJ selectively considered his daily activities, failing to mention certain "qualifications" on his activities of daily living.  Specifically, Plaintiff contends that the ALJ erred by not mentioning that he:  (1) cooks only "as long as his hand tremors do not cause him to splash hot grease on himself," (2) cannot type and can only use his computer "if he keeps his hand flat," (3) cannot write due to hand tremors, and (4) shops only "once every three months."  (Doc. 22 at 16, citing R. 53, 63, 177, 179).  But the ALJ did, in fact, acknowledge his difficulties using the computer, expressly stating that he can "use a computer, albeit as long as his hand is flat."  (R. 30).  The ALJ also acknowledged his difficulty writing, stating that Plaintiff "indicated that he has problems gripping and writing."  (*Id.*)  That the ALJ did not mention the other two items does not render her credibility analysis inadequate, as an ALJ is not required to discuss every piece of evidence, but must only create a "logical bridge" between the evidence and her conclusions.  *See Castile*, 617 F.3d at 929.  The ALJ here did that,

describing Plaintiff's daily activities as he testified to them in the Function Reports and at the hearing, and mentioning several ways in which Plaintiff stated his daily activities were impaired, including the two identified above. Accordingly, Plaintiff has not shown that the credibility determination is patently wrong in this respect.

### b. Severity of Symptoms

Plaintiff next argues that his hand tremors, anemia, and hip and leg pain are more severe and limiting than the ALJ found them to be. In assessing a claimant's credibility when the allegedly disabling symptoms, such as pain, are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, 1996 WL 374186, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96-7p). The ALJ "should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila*, 573 F.3d at 517 (quoting 20 C.F.R. § 404.1529(c)(2)-(4)).

Here, the ALJ cited ample medical and other evidence supporting the conclusion that Plaintiff's impairments were not as debilitating as he alleged. For example, regarding his hand tremors, the ALJ noted Plaintiff's testimony that "he had tremors all his life and that they were being worked up," and that "he had problems gripping and writing," but that he is able to play cards and dominoes, take public transportation, and keep his apartment neat, and is going to be trained for possible jobs in landscaping and

oil changing.  (R. 30).  She concluded that "the record fails to show he has had any treatment for his tremors or that there is any pending workup," and that the "record as a whole, including claimant's testimony, fails to establish that his tremors would cause any restrictions in his ability to handle, feel or finger."  (R. 30).  In particular, the ALJ noted that Plaintiff "said his doctor has given him a 10-pound weight restriction, but this is unsupported."  (*Id.*).  She also detailed that consulting examiner Dr. Carlton determined that Plaintiff "had normal grip strength in each hand and his grip and prehension ability were normal as were his fine and gross motor skills," and that he found "no obvious signs of tremors or hand weakness."  (R. 24-25).   The ALJ also noted that Plaintiff "did not stop working due to a medical reason; he was laid off," which further undermines his allegations of disabling impairments.  (R. 29).  This was ample evidence upon which to find that Plaintiff was not credible concerning the severity of his hand tremors.

Plaintiff also asserts that his anemia causes fatigue severe enough to limit him to sedentary work and that the ALJ should have found him credible on this issue.  But as the Commissioner notes, there is nothing in the record linking his anemia to any purported fatigue.  While Plaintiff cites evidence that he was diagnosed with anemia, the only evidence related to fatigue is his own statements in the August 2009 Function Report that he "stay[s] awake most of the night" and do[es] not sleep over 2 hours at a time" and in the March 2010 Function Report that he "takes cat naps, 15-20 minutes." (R. 177, 222).  The ALJ acknowledged this testimony (R. 21) and recounted the limited medical history of his treatment for anemia (R. 29).  But there is nothing in the record linking these alleged sleeping problems to his anemia, as opposed to his depression or

any other impairment.  Thus, the ALJ did not err in concluding that "the record fails to show that his anemia causes disabling fatigue or other restrictions."  (R. 30).

Finally, Plaintiff makes a cursory assertion that the ALJ erred in finding him less than credible concerning the severity of his hip and leg pain.  But he only mentions this in the section heading in his opening brief without discussing it in his analysis (Doc. 22 at 17-18), and fails to mention it at all in his reply brief.  The ALJ considered Plaintiff's testimony concerning leg and hip pain, but found him not fully credible given that his allegations that "his legs go out" are "not supported in the objective medical evidence," and that he "alleged his hip hurts him, but he has had no treatment for that complaint." (R. 30).  In any event, because Plaintiff has not developed this argument whatsoever, the Court need not address it and declines to find the ALJ's credibility determination deficient in this respect.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 22] is denied and Defendant's Motion for Summary Judgment [Doc. 34] is granted.  The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated: January 31, 2014

_____

SHEILA FINNEGAN
United States Magistrate Judge